**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DARRICK LEE SIDES,

                              Plaintiff,

            v.                                          No. 9:15-CV-1203
                                                        (MAD/CFH)
DOCTOR PAOLANO; et al.,

                              Defendants.
_____

**APPEARANCES:**                          **OF COUNSEL:**

DARRICK LEE SIDES
96-A-5286
Groveland Correctional Facility
7000 Sonyea Road
Sonyea, New York 14556
Plaintiff pro se

HON. ERIC T. SCHNEIDERMAN              CHRISTOPHER J. HUMMEL, ESQ.[1]
Attorney General for the              Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224-0341
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

     Plaintiff pro se Darrick Lee Sides ("Sides" or "Plaintiff"), an inmate who was at all

relevant times in the custody of the New York Department of Corrections and Community

Supervision ("DOCCS"), alleges that Defendants Nurse P. Snyder ("Snyder"), Nurse P.

_____

     [1]  The undersigned is not related to the Assistant Attorney General.

     [2]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

Schmidt ("Schmidt"), Doctor Paolano ("Paolano"), and Doctor Jon Miller ("Miller") were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Dkt. No. 1 ("Compl.").

## I. Background

## A. Facts

The facts are reviewed in the light most favorable to Sides as the non-moving party. See subsection II (A) infra. On August 5, 2008, Sides arrived at Coxsackie Correctional Facility ("Coxsackie C.F."). Dkt. No. 41 at p. 10. On January 15, 2009, Miller saw Sides for complaints of rectal bleeding. Dkt. No. 40-6 at ¶ 7; Dkt. No. 41 at 108. Miller ordered blood-work, which was completed on January 27, 2009, and referred Sides for a colonoscopy.[3] Dkt. No. 40-6 at ¶ 7;  Dkt. No. 41 at 107. On March 10, 2009, Sides underwent the colonoscopy at Albany Medical Center. Dkt. No. 40-6 at ¶ 8. On May 8, 2009, Miller reviewed the results of the procedure and advised Sides that he suffered from medium-sized, non-bleeding hemorrhoids. Id. at ¶¶ 8, 9. Miller prescribed Metamucil to treat Sides' symptoms and concluded that a hermorrhoidectomy was not medically necessary. Id. at 9, 10.

On September 14, 2011, Sides attended sick call with Schmidt for complaints of bleeding hemorrhoids. Dkt. No. 40-7 at ¶ 10. Plaintiff reported that he was taking "four or five Ibuprofen a day for headaches." Dkt. No. 41 at 104; Dkt. No. 41-3 at 21. Schmidt

---

[3] The ambulatory record was prepared by Schmidt. See Dkt. No. 41 at 107. Schmidt contends that she recorded the blood draw but that Sides' blood was drawn by another individual. See Dkt. No. 40-7 at ¶ 9.

scheduled an appointment with Paolano.  Dkt. No. 40-7 at ¶ 10; Dkt. No. 41 at 104.

On September 27, 2011, Paolano provided treatment for Sides' headaches and symptoms related to hemorrhoids.  Dkt. No. 40-5 at ¶ 7.  Paolano prescribed Ibuprofen, Metamucil, ointment, and a suppository to treat Sides' symptoms.  Id.; Dkt. No. 41 at 102-103.  On October 27, 2011, Sides attended sick call with Schmidt for complaints related to hemorrhoid pain.  Dkt. No. 41 at 100.  Schmidt provided Metamucil, hemorrhoid cream, and psyllium powder.  Id. at 98.

On July 31, 2012, Sides returned to Paolano with complaints related to hemorrhoid pain and rectal bleeding.  Dkt. No. 40-5 at ¶ 8.  Sides advised that he stopped taking suppositories "two weeks ago" as he believed that the treatment exacerbated his symptoms.  Dkt. No. 41 at 85.  Paolano determined that Sides' symptoms "seemed to have worsened and not respond[ing] to medical care with hydrocortisone, creams and stool softeners" and referred him for a surgical consultation and blood-work.  Dkt. No. 40-5 at ¶ 8; Paolano also requested a follow up appointment in one month.  Id.; Dkt. No. 41 at 151, 184.  On August 7, 2012, the blood-work was completed.  Dkt. No. 40-5 at ¶ 16.

On August 8, 2012, Miller reviewed the results of the blood-work and noted "follow up will be arranged with a primary provider[,]" which indicates to the nursing staff that an additional appointment should be scheduled to further evaluate the patient.  Dkt. No. 40-6 at ¶ 14; Dkt. No. 41 at 122-123.  Miller also indicated, "notification form completed and distributed."[4]  Id.

---

[4]  Although "notification" indicates to the nursing staff that the patient should receive a copy of the blood work results, see Dkt. No. 40-6 at ¶ 33, Sides claims that he did not receive such notification.  Dkt. No. 43-2 at 9.

3

On August 22, 2012, Dr. Conete examined Sides.[5]  Dkt. No. 40-6 at ¶ 17.  Dr. Conete

recommended a colonoscopy and excisional hemorrhoidectomy.  Id.  The Request and

Report of Consultation contains the following notation, "[c]onsultation is a recommendation.

Final determination will be made by the inmate's NYSDOCS physician."  Dkt. No. 41 at 127.

On August 28, 2012, Miller received and reviewed Dr. Conete's report.  Dkt. No. 40-6 at ¶

18.

On August 28, 2012, Sides accepted medication, including Rantidine[6], Ibuprofen, and

psyllium powder, from a nurse.[7]  Dkt. No. 41 at 82.  Sides was scheduled to be seen by

Paolano on August 30, 2012.  Dkt. No. 40-4 at ¶ 10.  On August 28, 2012, that appointment

was cancelled "due to some occurrence at the facility outside the control of the medical

staff."  Dkt. No. 40-6 at ¶ 19; Dkt. No. 40-5 at ¶ 13.

On September 25, 2012, Sides met with Paolano.  Dkt. No. 40-5 at ¶ 16; Dkt. No. 71 at

23.  Based on the blood-work results, Paolano determined that Plaintiff was anemic and

ordered additional blood-work to be completed on the next available day.  Dkt. No. 40-5 at

¶ 16.  Paolano also contacted Dr. Conete to discuss Plaintiff's anemia.  Id.  On September

27, 2012, Sides had his blood drawn.  Dkt. No. 40-5 at ¶ 16.

On September 28, 2012, Miller reviewed the results of the blood-work and referred

Sides to Albany Medical Center for further medical attention. Dkt. No. 40-6 at ¶ 24.  Later

---

[5]  Dr. Conete is not a defendant herein.

[6]  Rantidine is prescribed to treat ulcers or acid reflux disease.  See https://www.fda.gov (last visited Apr. 17, 2020).

[7]  The nurse who provided the medication is not a defendant herein.  See Dkt. No. 41 at 82.

that day, Sides was admitted to Albany Medical Center.  Dkt. No. 41 at 128.  Sides received

a blood transfusion and underwent a colonoscopy to evaluate his hemorrhoids.  Dkt. No.

40-6 at ¶ 25.  The colonoscopy revealed stage III hemorrhoids, and, as a result, medical

staff at Albany Medical Center deemed a hemorrhoidectomy medically necessary.  Id.  On

October 4, 2012, Sides underwent a hemorrhoidectomy.  Id.  On October 6, 2012, Sides

returned to Coxsackie C.F.  Id.

Following his discharge from Albany Medical Center, Sides was housed in the infirmary

and received care to ensure that he recovered from his procedure.  Dkt. No. 40-5 at ¶ 20.

On October 9, 2012, Sides denied experiencing any rectal bleeding and was discharged

from the infirmary.  Id.  In October 2012, Sides submitted a request for copies of his

medical records.  Dkt. No. 41 at 15.

On November 6, 2012, Paolano evaluated Sides and ordered blood-work.  Dkt. No. 40-

5 at ¶ 21.  On November 15, 2012, Paolano met with Sides to discuss the results of the

blood- work.  Id. at ¶ 22.  On January 10, 2013 and January 24, 2013, Paolano provided

additional post-surgical treatment.  Id. at ¶ 23.

With respect to grievances, Sides alleges that he filed a grievance in August 2012 with

complaints of bleeding.[8]  Dkt. No. 41 at 13; Dkt. No. 43-1 at 15.  In July 2013, Sides filed a

grievance claiming that, despite his request in October 2012, he had not received medical

records related to his treatment at Albany Medical Center.  Dkt. No. 40-3 at 8.  On July 25,

2013, the Inmate Grievance Resolution Committee accepted the grievance and advised

Sides that his records were recently received by the medical department and would be

---

[8]  Defendants dispute this contention.

issued upon clearance.  Id. at 9.


## B.  Procedural History

In October 2015, Sides commenced this action.  See Dkt. No. 56 at 4.  Within his Complaint, Plaintiff filed a motion for preliminary injunctive relief seeking an order directing Defendants to provide hospital treatment, a special diet, and to "screen" him for disease. See Dkt. No. 2.  Upon review of the Complaint, the Court directed Defendants to respond to the Eighth Amendment claims and denied the motion for injunctive relief.  See Dkt. No. 6.

Defendants moved for summary judgment arguing that Sides' claims were barred by the statute of limitations, or, in the alternative, Sides failed to exhaust his administrative remedies.  Defendants also argued that Sides failed to establish a prima facie claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, or, in the alternative, Defendants are entitled to qualified immunity.[9]  See generally Dkt. No. 40.

On January 8, 2018, the undersigned issued a Report-Recommendation and Order recommending that Defendants' motion for summary judgment and dismissal of this action be granted as time barred.  See Dkt. No. 48.  The undersigned concluded that, for the purposes of the statute of limitations, the Complaint was filed on October 5, 2015, and that Sides did not present any evidence establishing that he was entitled to the benefit of the continuing violation doctrine or equitable tolling.  See Dkt. No. 48 at 14-18.  On March 29,

---

[9]  The motion was submitted on behalf of Defendants Paolano, Miller, and Schmidt.  See Dkt. No. 40-8 at 3, n.1.

2018, Hon. Mae A. D'Agostino adopted the Report-Recommendation & Order.  See Dkt.
No. 50.

On November 13, 2019, the Second Circuit reversed the dismissal order and remanded
the action holding that, "[t]he District Court has not yet ruled, [ ], on the argument that Sides
emphasizes on appeal: whether Sides' inability to access notary services during the eight
days between September 21 and 29 entitles him to equitable tolling."  See Dkt. No. 56 at 4.
In remanding, the Second Circuit invited this Court to address on remand Defendants'
claims of "qualified immunity and Sides's failure in conflict with the Prison Litigation Reform
Act . . . to exhaust administrative remedies" and "other defenses."  See id. at 5. The parties
submitted additional briefing (Dkt. Nos. 65 and 66), which the undersigned takes into
consideration.


## II.  Discussion

### A.  Legal Standards

A motion for summary judgment may be granted if there is no genuine issue as to any
material fact, it was supported by affidavits or other suitable evidence, and the moving party
is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the
burden of demonstrating the absence of disputed material facts by providing the court with
portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P.
56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may
affect the outcome of the case as determined by substantive law.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 317, 248 (1986).  All ambiguities are resolved and all reasonable

inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

**B.  Statute of Limitations**

The statute of limitations period for section 1983 claims brought in federal court in New

8

York is three years.  Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda, 572 F.3d 93,

94 (2d Cir. 2009).  Generally, a section 1983 claim accrues "when the plaintiff knows or has

reason to know of the harm."  Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009).

With respect to deliberate indifference claims, the action accrues when the plaintiff "knows

or has reason to know of the injury."  Whitfield v. O'Connell, No. 09 Civ. 1925, 2010 WL

1010060, at *5 (S.D.N.Y. Mar. 18, 2010), aff'd, 402 F. App'x 563 (2d Cir. 2010) (summary

order).[10]

In this case, the Second Circuit concluded that Sides filed his complaint "no earlier than

October 1, 2015" and that he was aware of his injury in August 2012, when he filed a

grievance concerning his medical condition.  See Dkt. No. 56 at 2-3.  The Circuit also found

that the three year limitations period began to run on September 28, 2012, when Sides was

no longer in Defendants' care.  See id.  Therefore, the Second Circuit concluded that the

Complaint was untimely – unless equitable tolling applies.  See id. at 4.


## a. Equitable Tolling

Equitable tolling of the statute of limitations is applicable in certain situations where the

Court determines that a plaintiff should, in fairness, be excused from his or her lateness in

filing a complaint.  Gonzalez v. Hasty, 651 F.3d 318, 323-24 (2d Cir. 2011).  "Equitable

tolling is an extraordinary measure that applies only when plaintiff is prevented from filing

despite exercising that level of diligence which could reasonably be expected in the

---

[10]  Unless otherwise indicated, unpublished cases cited herein have been provided to plaintiff pro se.

circumstances." Id. (quoting Veltri v. Bldg. Serv. 32-J Pension Fund, 393 F.3d 318, 322 (2d Cir. 2004)); Lyons v. Emerick, 187 F. App'x 219, 221 (3d Cir. 2006) (summary order) ("[I]n order to be eligible for equitable tolling, a plaintiff must exercise "reasonable diligence in investigating and bringing [his or her] claims."). The plaintiff bears the burden of showing that he or she is entitled to equitable tolling. See Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007).

Sides alleges that the doctrine of equitable tolling excuses his lateness in filing his Complaint because he requested that the prison provide a notary to assist him in finalizing the Complaint on September 21, 2012, but he did not receive assistance until September 29, 2012. See Dkt. No. 65-1 at 36-37. Accordingly, Sides argues that he is entitled to equitable tolling for eight days, which would have extended the statute of limitations deadline until October 6, 2012, rendering the Complaint timely. See id.

In the Mandate, the Second Circuit addresses Sides' tolling argument and noted that Sides alleges that he misunderstood what was required because he relied upon a "pro se handbook and a prisoner manual counseled (perhaps erroneously) that complaints be notarized." See Dkt. No. 56 at 4. The Second Circuit further opines, "it is true that complaints seeking preliminary injunctive relief (as Sides did) ordinarily require notarization." See Dkt. No. 56 at 4-5 (citing N.D.N.Y. L.R. 7.1(a)).

As directed by the Second Circuit, dkt. no. 56, the undersigned has considered these arguments, and, upon further review of the record, the Federal Rules of Civil Procedure, and this Court's Local Rules, finds Sides' arguments unpersuasive. A plaintiff's "pro se status" and "ignorance of the law do not constitute the 'rare and exceptional

circumstance[s]' that warrant equitable tolling." Johnson v. Arnone, No. 3:15-CV-00532, 2015 WL 9451029, at *1 (D. Conn. Dec. 23, 2015) (quoting Rudaj v. Treanor, 522 F. App'x 76, 77 (2d Cir. 2013) (summary order)). Fed. R. Civ. P. 11(a) provides, "[u]nless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit." FED. R. CIV. P. 11. The Court finds that there is no such "rule or statute" applicable to the facts of this case. Northern District of New York Local Rule 7.1, cited in the Mandate, does not pertain to pleadings. Rather, Rule 7.1(a), entitled Motion Practice, provides:

> Papers Required. Except as otherwise provided in this paragraph, all motions and opposition to motions require a memorandum of law, supporting affidavit, and proof of service on all the parties. See L.R.5.1(a). Additional requirements for specific types of motions, including cross-motions, see L.R. 7.1(c), are set forth in this Rule.

N.Y.N.D. L.R. 7.1(a).

In his Complaint, Sides seeks compensatory damages and "an injunction as proposed." See Compl. at 18. On the same day that the Complaint was filed, Sides filed a separate "order to show cause for preliminary injunctive relief and a temporary restraining order," which was notarized on September 29, 2015. See Dkt. No. 2 at 2. Even assuming, arguendo, that Sides was required to have his motion for preliminary injunctive relief notarized, the Federal Rules and Local Rules do not require a complaint and a motion for preliminary injunctive relief be filed simultaneously. Thus, because there is no requirement that a complaint filed in federal court be notarized, regardless of the relief sought, Sides has not presented the Court with a "rare and exceptional circumstance" warranting the

11

application of equitable tolling.  Johnson v. Arnone, No. 3:15-CV-00532, 2015 WL 9451029, at *1 (D. Conn. Dec. 23, 2015) (rejecting the inmate's tolling argument based on his inability to have the complaint notarized for six days) (citation omitted); see, e.g., Darby v. Dallas Cty. Sheriff, No. 3:06-CV-1928, 2007 WL 2428582, at *4 (N.D. Tex. Aug. 24, 2007) (rejecting the plaintiff's excuse that he could not timely file his § 1983 complaint because he was waiting for a notarized copy of his prison account statement); see also White v. Czerwinkski, No. 18-CV-1545, 2019 WL 3358719, at *1 (E.D. Wis. July 25, 2019) (reasoning that "[a]ll [the [p]laintiff had to do was sign the document. Thus, his difficulties with notarization supply no basis to justify the tardy filing."); Williams v. I.D.O.C. Law Library Program, No. 96 C 2099, 1997 WL 106174, at *4 (N.D. Ill. Jan. 27, 1996) ("Notarization is unnecessary for filings in federal court, since an unsworn declaration under penalty of perjury has the effect of a notarized affidavit.") (citing 28 U.S.C. § 1746).

Moreover, to receive the benefit of equitable tolling, a plaintiff must demonstrate that he or she pursued the action with the appropriate amount of diligence; yet, such evidence is lacking here.  "Due diligence on the part of the plaintiff in bringing [an] action," [ ] is an essential element of equitable relief."  Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) (citation omitted).  "The fact that a prisoner does not, by virtue of his confinement, have twenty-four-hour-a-day access to the law library or a notary is not a basis for tolling the statute of limitations."  Andolina v. Kenny, No. 09-CV-379 (TJM/RFT), 2010 WL 786302, at *4 (N.D.N.Y. Mar. 3, 2010) (reasoning that "prisoners must [ ] plan accordingly or risk the possibility of making untimely legal filings."); see also Lyons, 187 F. App'x at 222 (concluding that the plaintiff did not act with "reasonable diligence" because he had two

years to file his complaint but "waited until the last minute when his schedule was derailed by a delay for the paperwork necessary to file his complaint in forma pauperis.").  In the present action, Sides has not provided the Court with any evidence to demonstrate that he acted "with reasonable" diligence in bringing the action or that Defendants interfered with his access to notary services.

Thus, the undersigned concludes that Sides' inability to timely obtain a notary for his Complaint does not warrant the "extraordinary measure" of equitable tolling.  Accordingly, the undersigned recommends granting Defendants' motion for summary judgment on this ground.

## B.  Exhaustion

Defendants argue that, even assuming that Sides timely filed his action, the motion for summary judgment must be granted because he failed to exhaust his administrative remedies through available grievance procedures.  See Dkt. No. 40-8 at 9-12.  The Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006).  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  Id. at

13

524.  To exhaust administrative remedies, the inmate must complete the full administrative

review process set forth in the rules applicable to the correctional facility in which he or she

is incarcerated.  Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court of the United States has deemed exhaustion mandatory,

the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of

Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).  The Supreme Court has held

that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the

PLRA's exhaustion requirement."  Ross v. Blake, __ U.S. __, 136 S. Ct. 1850, 1862 (2016).

As such, the special circumstances exception promulgated by the Second Circuit in

Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004), is no longer consistent with the

PLRA's  statutory requirements.  Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[11]

Although Ross eliminates the "special circumstances" exception, courts must still

consider the PLRA's "textual exception to mandatory exhaustion."  Ross, 136 S. Ct. at

1858.  Under this exception, courts must determine whether administrative remedies were

"available" to a prisoner.  Id.  The Supreme Court identified three circumstances where

administrative remedies may be unavailable to a prisoner.  First, "an administrative

procedure is unavailable when (despite what regulations or guidance materials may

promise) it operates as a simple dead end—with officers unable or consistently unwilling to

---

[11]  In Williams v. Priatno, the Second Circuit debated Ross' effect on Hemphill's estoppel exception.
See Williams, 829 F.3d at 123.  The Williams Court stated that "Ross largely supplants our Hemphill inquiry
by framing the exception issue entirely within the context of whether administrative remedies were actually
available to the aggrieved inmate."  Id. (citing Ross, 136 S.Ct. at 1858-59).

provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2015).  First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. at § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. at § 701.5(b)(1).  If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  Id. §§ 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii).  CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received."  Id. § 701.5(d)(3)(ii).

15

If it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice.  Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec's. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted).  As "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner . . . can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999)).  Sides does not dispute that a grievance process existed at Coxsackie C.F. and that he was aware of the process.  Dkt. No. 41 at 11, 13.


**1.  Did Plaintiff Exhaust his Administrative Remedies?**

In support of the motion for summary judgment, Defendants provided the Declaration of Jeffrey Hale ("Hale"), the Director of the Inmate Grievance Program ("IGP") for DOCCS. Dkt. No. 40-3.  Hale avers that "[c]omplaints or issues [violations under the Eighth Amendment involving medical indifference] are proper subject for a grievance under DOCCS grievance procedures as outlined at 7 N.Y.C.R.R. § 701.1 et seq." Id. at ¶ 6.  Hale reviewed Central Office Review Committee ("CORC") records for determinations on Sides' grievance appeals and found no grievance appeals relating to allegations of medical indifference by medical staff at Coxsackie C.F.  Id. at ¶ 9.  Defendants also submitted the Declaration of Tisha Surprenant ("Surprenant"), the Inmate Grievance Program ("IGP") Supervisor for Coxsackie C.F.  Dkt. No. 40-3.  Surprenant reviewed Coxsackie C.F. records and found no grievances filed by Sides related to allegations of deliberate medical

16

indifference for any medical condition in 2012, or at any other time.  Id. at ¶¶ 13, 14.

According to Surprenant, the only grievance Sides filed at Coxsackie C.F. was in July 2013

and related to his request for medical records.  Id. at ¶ 15.

Sides alleges that he properly grieved the issues addressed in this litigation because

he filed a grievance in August 2012 regarding complaints of bleeding.[12]  Dkt. No. 41 at 13;

Dkt. No. 43-1 at 15.  Sides testified that he discussed the grievance with the "grievance

supervisor":

> he pulled me out of line and he said, I got your grievance and
> I talked to medical.  They said you're in to see a specialist.
> He said I put the grievance to the side.  If you don't see the
> specialist within a week, or something like that, he said, send
> him a note, he'll put my grievance file and everything like that.
> And, like, right after that, maybe a week or two, maybe - - I
> give it no more than two weeks, I don't know the dates, but I
> seen the specialist and they examined me and he said, You
> need surgery.  And I signed some forms for all that stuff,
> something like that.

Dkt. No. 41 at 13.

Surprenant conducted a search for this grievance and contends that, "[a] review of my

office's records has revealed no record of the August 2012 letter of complaint."  Dkt. No.

40-3 at ¶ 16.  Defendants argue that, even assuming Sides filed the grievance, he failed to

exhaust because he did not complete the grievance process.  Dkt. No. 40-8 at 12; Dkt. No.

44 at 5.  In this regard, Sides concedes that he did not "follow up" or appeal the grievance.

Dkt. No. 41 at 14.  Specially, Sides testified:

---

[12]  Defendants refer to this correspondence as a "letter of complaint."  Dkt. No. 40-8 at 12.
However, during his deposition, Sides repeatedly refers to his complaint as a grievance and did not use the
term "letter."  See Dkt. No. 41 at 13-14.

Q.      After - - with respect to your grievance that you filed before you saw the specialist on August 22nd, 2012, did you appeal that grievance to the superintendent?

A.      No, sir, because he called - - I guess he handled it formally.  By me submitting the complaint he said it was serious.  So I guess he called the doctor, sick call, whatever, whoever he spoke to.  They said they told him that I was going to see a specialist about my condition.  So he said - - he put it to the side.  And he said if I don't see the specialist to send him a note.  So nine out of ten times he probably didn't file it, because sometimes that may happen.  Like, recently, the same thing - -

Q.      Hang on.  Hang on.  Let me ask you questions about this particular grievance.  When you say "he" you're referring to the - -

A.      It was a male supervisor, I don't really remember his name.

Q.      He was a grievance supervisor?

A.      Yes.

Q.      Okay.  And he asked you to send him a note if you didn't see a specialist?

A.      Yes.

Q.      And you didn't send him a note?

A.      No, because I seen a specialist.

Q.      So you didn't take any further action with respect to that grievance?

A.      No, sir, because when I went to see the specialist he said he going to put me in for surgery and some other type of tests to remove it, because I told him I just wanted the bleeding to stop.  I've been bleeding,

18

> complaining of this problem, since 1996.  So I
> assumed that it was going to get taken care
> of.

Dkt. No. 41 at 13-14.  Sides admits that he did not file any other grievances with respect to "this problem."  Id. at 13-14.

Sides knew how to complete the grievance process which is demonstrated by the fact that he previously appealed other grievances to CORC.  Dkt. No. 41 at 12-13; Dkt. No. 40-2 at ¶ 8.  Accordingly, Defendants have met their burden of demonstrating that a grievance procedure existed and that Sides failed to exhaust administrative remedies related to his medical condition.  As a result, the Court must assess whether administrative remedies were available to Sides.

### 2.   Availability of Administrative Remedies

Sides sets forth two plausible arguments to establish that administrative remedies were unavailable.

### a. "Emergency" Grievance

Sides first contends that the IGP Supervisor handled his August 2012 grievance as an "emergency medical complaint by his own formal matter."  Dkt. No. 43-1 at 15.  Sides argues that "there is no appeal mechanism" for grievances filed as "emergencies" pursuant to 7 N.Y.C.R.R. § 701.6(m).[13]  Dkt. No. 43-3 at ¶¶ 25-26.

---

[13]   N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(m):

Emergencies. The IGP supervisor shall refer any grievance of an emergency nature directly to the appropriate response level (superintendent or CORC) having authority to issue an immediate or expeditious and meaningful response. An emergency shall include, but is not limited to, a situation, action, or condition in which an inmate's or an employee's health,

The Court recognizes that a defendant's failure to act on a favorable resolution of a grievance does not require a plaintiff to appeal the grievance prior to filing suit.  See Abney v. McGinnis, 380 F.3d 663, 669 (2d Cir. 2004) (finding that a defendants' failure to implement rulings in the inmate's favor renders administrative relief "unavailable" under the PLRA); Smith v. NYC Dep't of Corr., No. 18-CV-7018, 2019 WL 2473524, at *3 (S.D.N.Y. June 13, 2019) (concluding that, because the plaintiff's grievance related to exposed metal protruding from a telephone resulted in the submission of a work order, it negated "any need for him to file an appeal" despite the fact that the work order was not completed); Benitez v. Straley, No. 01CIV.0181, 2006 WL 5400078, at *7 (S.D.N.Y. Feb. 16, 2006) (finding administrative remedies unavailable where grievances were resolved informally and there was no implementation of the resolution).

In this instance however, Sides' "unavailability" claim is unsupported by evidence in the record.  In response to the motion for summary judgment, Sides did not proffer a copy of his August 2012 grievance and did not submit any evidence related to how he submitted the grievance or to whom he gave the grievance for mailing or filing.  During his deposition, Sides testified that he could not recall the name of the IGP Supervisor or when he spoke to the supervisor.  Dkt. No. 41 at 14.

Without competent, admissible evidence supporting Sides' claim that he filed a grievance in August 2012, or any specific facts surrounding the grievance or the outcome, Sides' wholly conclusory assertions that administrative remedies were unavailable are

---

safety, or welfare is in serious threat or danger. The supervisor will determine if a grievance falls within this category.

insufficient to overcome Defendants' motion for summary judgment. <u>See</u> <u>Grayson v.</u>
<u>Courtney</u>, No. 9:16-CV-1118 (GLS/ATB), 2018 WL 6933296, at *6 (N.D.N.Y. Dec. 3, 2018)
(reasoning that, due to "the complete lack of corroboration" of the plaintiff's grievance
relating, "no rational fact finder could conclude that plaintiff actually attempted to file such a
grievance.") (collecting cases); <u>see</u> <u>Khudan v. Lee</u>, No. 12-CV-8147(RJS), 2016 WL
4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (concluding that the plaintiff failed to show a
genuine issue of material fact when he did not produce evidence other than his own
declaration and deposition); <u>see also</u> <u>Bolton v. City of New York</u>, Nos. 13-CV-5749,
13-CV-6090, 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) (holding that the plaintiff's
allegations, which "[stood] alone and unsupported," did not excuse plaintiff from failing to
exhaust his administrative remedies); <u>Thomas v. Cassleberry</u>, 315 F. Supp.2d 301, 304
(W.D.N.Y. 2004) (granting summary judgment on exhaustion issue because there was no
evidence that informal complaints had resolved matters in the plaintiff's favor).

### b.  Failure to Provide Medical Records

Sides next alleges that he was unable to exhaust his administrative remedies because
the Coxsackie C.F. medical clerk failed to respond to his request for medical records. <u>See</u>
Dkt. No. 43-1 at 14; Dkt. No. 40-3 at 8; Dkt. No. 43-3 at ¶ 45. Sides testified that he waited
for "ten months" for a response to his request for records and, by that time, "filing a
grievance would have been frivolous." <u>Id.</u>

"Administrative remedies are not available if prison officials 'interfere[ ] with an inmate's
pursuit of relief[.]'" <u>Kendall v. Cuomo</u>, No.1:12-CV-3438, 2017 WL 4162338, at *3 (S.D.N.Y.

21

Sept. 19, 2017) (citing <u>Ross</u>, 136 S.Ct. at 1860); <u>see also</u> <u>Veloz v. New York</u>, 339 F. Supp.2d 505, 515-16 (S.D.N.Y. 2004) (noting that "[w]hen an inmate's reasonable attempts to exhaust administrative remedies are impeded by a correctional officer" the remedy is unavailable).  In this instance, there is no evidence in the record that Defendants interfered with Sides' pursuit of the grievance procedure or evidence explaining why the medical records were necessary for him to file a grievance.  Moreover, the record belies Sides' claim because he was able to file a grievance on July 12, 2013 without the medical records and, if his testimony is to be believed, he filed a grievance in August 2012, without access to medical records.  <u>See</u> Dkt. No. 40-3 at 6, 8.  Thus, Sides' bare assertions that Defendants thwarted his attempts to file grievances are insufficient to demonstrate that the grievance process was rendered unavailable.

Accordingly, Defendants have met their burden of showing that Sides failed to exhaust his administrative remedies, and it is recommended that Defendants' motion for summary judgment be granted on this ground.

## C.  Eighth Amendment

Sides contends that Paolano, Miller, and Nurse Schmidt were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  <u>See</u> <u>generally</u> Compl. Construing the Complaint liberally, Sides alleges that Defendants were deliberately indifferent for failing to refer him to a specialist prior to July 31, 2012, and that Defendants violated his Eighth Amendment rights because they failed to implement Dr. Conete's recommendation and delayed surgery from July 31, 2012 until October 4, 2012, allowing

his condition to worsen.[14]  See Dkt. No. 40-8 at 14.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain."  U.S. CONST. AMEND. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  An Eighth Amendment claim for medical indifference has two necessary components, one objective and the other subjective.  Hathaway, 37 F.3d at 66.  The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious."  Id.  The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind."  Id.

For an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury.  See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain."  Hathaway, 37 F.3d at 66 (internal citation omitted).  "Determining whether a deprivation is an objectively serious deprivation entails two inquiries."  Salahuddin, 467 F.3d at 279.  First, the Court must determine "whether the prisoner was actually deprived of

---

[14]  Defendants describe the Eighth Amendment claims in this manner in the Memorandum of Law in support of the motion. Plaintiff does not object to Defendants' characterization of his claims.

adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537

(S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Prison officials are not

obligated to provide inmates with whatever care the inmates desire. Rather, prison officials

fulfill their obligations under the Eighth Amendment when the care provided is reasonable."

Jones v. Westchester Cnty. Dep't of Corrs. Med. Dep't, 557 F. Supp.2d 408, 413 (S.D.N.Y.

2008). However, a prison official may be held liable "if he knows that inmates face a

substantial risk of serious harm and disregards that risk by failing to take reasonable

measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). Second, the Court

must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry

requires the court to examine how the offending conduct is inadequate and what harm, if

any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at

280.

> [I]f the unreasonable medical care is a failure to provide any
> treatment for an inmate's medical condition, courts examine
> whether the inmate's medical condition is sufficiently serious.
> Factors relevant to the seriousness of a medical condition
> include whether a reasonable doctor or patient would find [it]
> important and worthy of comment, whether the condition
> significantly affects an individual's daily activities, and
> whether it causes chronic and substantial pain. In cases
> where the inadequacy is in the medical treatment given, the
> seriousness inquiry is narrower. For example, if the prisoner
> is receiving on-going treatment and the offending conduct is
> an unreasonable delay or interruption in that treatment, the
> seriousness inquiry focus[es] on the challenged delay or
> interruption in treatment rather than the prisoner's underlying
> medical condition alone. Thus, although we sometimes
> speak of a "serious medical condition" as the basis for an
> Eighth Amendment claim, such a condition is only one factor
> in determining whether a deprivation of adequate medical
> care is sufficiently grave to establish constitutional liability.

24

Id. (internal citation and quotation marks omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280 (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 694 F. Supp.2d 137, 154 (N.D.N.Y. 2010) (citing Farmer, 511 U.S. at 844). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp.2d 457, 481 (S.D.N.Y. 2013) (citation and internal

25

quotation marks omitted).  It is well settled that "[i]nmates do not have a right to chose [sic] a specific type of treatment."  <u>Veloz</u>, 339 F. Supp.2d at 525.  A medical "professional's decision not to administer a specific medical test, regardless of a prisoner's disagreement with that decision, 'is a classic example of the type of medical judgment that is given judicial deference, and does not form the basis of a deliberate indifference claim.'"  <u>Curtis v. Williams</u>, No. 11 Civ. 1186, 2013 WL 1915447, at *7 (S.D.N.Y. May 9, 2013) (quoting <u>Verley v. Goord</u>, 02-Civ-1182, 2004 WL 526740, at *12 (S.D.N.Y. Jan. 23, 2004) and <u>Estelle</u>, 429 U.S. at 107) ("[A] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.")).  For the purposes of this motion, Defendants do not dispute that Plaintiff suffered from a serious medical condition.  <u>See</u> Dkt. No. 44 at 6.


### a. Treatment Prior to July 31, 2012

Sides concedes that, from 2009 until September 2012, he was treated twenty times at Coxsackie C.F. for rectal bleeding and related symptoms.  Dkt. No. 43-1 at 23; Dkt. No. 43-3 at ¶ 7.  Despite that fact, Sides alleges that Defendants were deliberately indifferent to his medical condition because they continuously prescribed medication to treat his rectal bleeding instead of referring him for hemorrhoid surgery earlier than July 2012.  <u>See</u> Dkt. No. 41 at 26-27.  Sides claims that he was given "Ibuprofen in error" and contends that Defendants should have "draw[n] the inference that [his] rectal bleeding had gone beyond initial treatment of metamucil and stool softeners[.]"  <u>See id.</u>; Dkt. No. 43-3 at ¶ 41.

To satisfy the objective component of this Eighth Amendment claim, Sides must prove

26

that he was deprived of adequate medical care prior to July 31, 2012. In this regard, the Court has reviewed the entire medical record and finds that Sides failed to provide evidence from which a factfinder could reasonably conclude that Defendants' provided Sides with inadequate treatment during that time frame. In fact, the record establishes the opposite.

Although Sides transferred to Coxsackie C.F. in August 2008, see Dkt. No. 41 at 10, he did not seek medical attention for rectal bleeding until January 2009. See Dkt. No. 41 at 108. During his first visit with Miller in January 2009, Miller referred Sides for blood-work and a colonoscopy. Dkt. No. 40-6 at ¶ 7. In March 2009, Sides underwent a colonoscopy. Id. at ¶¶ 8, 9. In May 2009, Miller prescribed Metamucil to treat Sides' symptoms. Id.

After May 2009, Sides' complaints regarding rectal bleeding were not continuous. Moreover, some of his complaints were made to individuals who are not defendants in this action. From May 2009 until October 2010, Sides did not make any complaints to medical providers concerning rectal bleeding or hemorrhoids. In November 2010, Sides was treated for complaints of bleeding hemorrhoids, but not by Defendants. Dkt. No. 41 at 104. From December 2010 until July 2011, Sides did not make any complaints to any medical providers concerning rectal bleeding or hemorrhoids. Id. In August 2011, Sides was treated for a "hemorrhoid flare up," but not by Defendants. Id.

Although Sides claims that his condition did not respond to medications, this allegation is not supported by the record. In October 2011, Paolano prescribed Metamucil, Ibuprofen, a suppository, and an ointment. Dkt. No. 40-5 at ¶ 7; Dkt. No. 41 at 102-104. From October 2011 until April 2012, Sides accepted the medications, without complaints.

27

Moreover, the record is devoid of any indication that his symptoms were worsening with the treatment. Dkt. No. 41 at 85-104. Indeed, Sides did not request medical treatment or make any complaints during that time. Id. The next treatment Sides received for his rectal bleeding was July 2012. Id. at 85. In July 2012, Sides informed the medical providers that he stopped taking his suppository "two weeks ago as he believes they made him bleed more." Dkt. No. 41 at 85. At that time, Paolano concluded that Sides was not responding to the treatment and referred him to a specialist. Id. at 84; Dkt. No. 40-5 at ¶ 7. From a review of the record, the undersigned concludes that Defendants provided Sides with consistent and reasonable care, in response to his complaints.

With respect to the subjective component, Sides fails to establish that Defendants knew of and disregarded an "excessive risk" to his health. Farmer, 511 U.S. at 837. The record demonstrates that Defendants addressed Sides' complaints through blood tests, a colonoscopy, and medication. For nine months, Sides accepted his prescribed medications, without complaint. In July 2012, when Sides told Paolano that his condition was not improving, Paolano referred Sides to an outside medical provider. Thus, Sides' conclusory allegation that Defendants failed to follow the professional standard of care does not constitute a constitutional violation.

In this instance, even if Defendants' continuing treatment of Sides' hemorrhoids with medications and ointments, rather than immediately referring him to a specialist, caused him unintended harm, negligence is not actionable under section 1983. Burroughs v. Petrone, 138 F. Supp.3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.")

28

(internal quotation marks and citation omitted); <u>Kucharczyk</u>, 95 F. Supp.3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference."); <u>Adams v. Rock</u>, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *7 (N.D.N.Y. Mar. 24, 2015) (citing <u>Farmer</u>, 511 U.S. at 835) ("Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.").

The facts of this case are very similar to those presented in <u>Castillo v. Rodas</u>, No. 09 Civ. 9919, 2014 WL 1257274 (S.D.N.Y. Mar. 25, 2014). In <u>Castillo</u>, the plaintiff alleged that the defendant was deliberately indifferent to his "severe and worsening hemorrhoid symptoms" and continued to provide "the same non-surgical treatments" which were ineffective. <u>Id.</u> at *7. The Court reviewed the medical record and found that the plaintiff's complaints related to his hemorrhoids were inconsistent and that he received medical treatment without complaints that his symptoms were severe or getting worse. <u>Id.</u> The Court further concluded that, "[t]he record simply reflects that [the] [p]laintiff saw the medical staff several times and received hemorrhoid cream. No reasonable jury could conclude that, during this period, [the defendant] was 'actually aware' that the treatments he was prescribing put [the] plaintiff at a 'substantial risk' of 'serious harm.'" <u>Castillo</u>, 2014 WL 1257174, at *7 (citations omitted). Moreover, the <u>Castillo</u> Court noted that once the plaintiff's symptoms became more severe, the defendant recognized that "the conservative course of treatment he had previously recommended was 'no longer effective'" and referred the plaintiff to a surgeon. <u>Id.</u> at *8.

Here, based upon a review of the medical record from January 2009 until July 2012, the undersigned concludes that Sides has failed to raise a material question of fact

regarding the adequacy of his medical treatment and Defendants' culpable state of mind.
Accordingly, it is recommended that Defendants' motion be granted on this ground.

### b. Surgery and Treatment After July 31, 2012

Sides alleges that Defendants were deliberately indifferent to his serious medical
needs because they failed to adopt Dr. Conete's recommendation, resulting in his condition
worsening and the need for emergency surgery.  Dkt. No. 43-1 at 20; Dkt. No. 43-3 at ¶ 33,
40.  Sides contends that Defendants were aware that he was "severely anemic" and
allowed him to "suffer unnecessarily without treatment for rectal bleeding."  Dkt. No. 43-3 at
¶¶ 20, 39.

"[A] prison doctor who relies on his medical judgment to modify or disagree with an
outside specialist's recommendation of how to treat an inmate is not said to act with
deliberate indifference." Benitez v. King, 298 F. Supp.3d 530, 538 (W.D.N.Y. 2018)
(collecting cases).  Moreover, "[w]hen the basis of a prisoner's Eighth Amendment claim is
a temporary delay or interruption in the provision of otherwise adequate medical treatment,
it is appropriate to focus on the challenged delay or interruption in treatment rather than the
prisoner's underlying medical condition alone in analyzing whether the alleged deprivation
is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim."
Brunskill v. County of Suffolk, No. 11-CV-586, 2012 WL 2921180, at *3 (E.D.N.Y. July 11,
2012) (citing Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)); see also Salahuddin v.
Goord, 467 F.3d 263, 280 (2d Cir. 2006) ("[I]f the prisoner is receiving on-going treatment
and the offending conduct is an unreasonable delay or interruption in that treatment, the

seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.") (internal quotation marks, alteration, and citation omitted)).  Courts have found delay to constitute deliberate indifference when "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." Brunskill, 2012 WL 2921180, at *3 (citation omitted).

### i. Miller and Paolano

On August 22, 2012, Dr. Conete recommended that Sides undergo a colonoscopy and hemorrhoidectomy.  Dkt. No. 41 at 153.  The record does not clearly indicate whether Miller and/or Paolano agreed with Dr. Conete's recommendations or approved the surgery.  Even assuming, arguendo, that they did not, a difference in opinion among the doctors does not render Defendants deliberately indifferent.  See Sonds v. St. Barnabas Hosp. Corr. Health Services, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2021) ("disagreements over . . . forms of treatment . . . are not adequate grounds for a Section 1983 claim."); Bruno v. Wright, No. 9:06-CV-0808 (DNH/DEP), 2008 WL 5100278, at *8 (N.D.N.Y. Nov. 26, 2008) ("While plaintiff clearly would have preferred that the DOCS physicians and specialist simply adopt the recommendation of the CMH physician, they are not required to do so.").

Next, the record does not support Sides' contention that Defendants failed to respond to his worsening condition.  Indeed, from August 28, 2012 until September 10, 2012, Sides did not make any complaints of rectal bleeding nor did he submit any requests for sick call. Dkt. No. 40-5 at 14; Dkt. No. 40-6 at 20.  On September 10, 2012, Sides was seen at sick

31

call by a nurse, who is not a defendant herein, for complaints of dizziness, shortness of breath, and loose stool.  Dkt. No. 41 at 82.  When Paolano saw Sides on September 25, 2012, Paolano ordered an EKG, diagnosed Sides with anemia, contacted Dr. Conete, and ordered blood-work.  Dkt. No. 41 at 82; Dkt. No. 40-5 at 16; Dkt. No. 43-3 at ¶ 35. When Miller received the results of Sides' blood-work, Sides was immediately transferred to Albany Medical Center where he underwent a blood transfusion, colonoscopy, and hermorrhoidectomy.  Dkt. No. 40-6 at ¶¶ 24, 25; Dkt. No. 41 at 80.

A review of the record reveals no evidence that Defendants ignored Sides' complaints of pain or that Defendants were unresponsive when Sides' condition deteriorated.  See Castillo, 2014 WL 1257274, at *10 (concluding that there was no evidence that the defendant's examinations of the plaintiff were inadequate or that the defendant believed that the plaintiff faced a significant risk of serious harm without surgery).

To the extent that Sides argues that Defendants acted with culpable intent when his August 30, 2012 appointment was rescheduled for September 25, 2012, there is no evidence suggesting that Defendants were responsible for postponing the appointment until September 25, 2012.  Moreover, even assuming that Miller and Paolano were somehow negligent in failing to schedule their own appointments or follow up to ensure that Sides was scheduled for a further visit or an earlier visit, as stated above, negligence does not equate to deliberate indifference and will not support an Eighth Amendment claim. Burroughs, 138 F. Supp.3d at 211.

Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Sides' claim that Miller and Paolano violated his Eighth

Amendment rights through their deliberate indifference to his serious medical needs be granted on this ground.

### ii. Schmidt

Schmidt avers that, on September 25, 2012, she followed Paolano's orders and scheduled Sides to have his blood drawn. Dkt. No. 40-7 at ¶ 12. On September 27, 2012, Schmidt entered a notation in Sides' health record, but another individual was responsible for Plaintiff's blood draw. Id. at ¶ 13. Schmidt did not provide any further care until after Plaintiff's surgery. Id. at ¶ 14. Schmidt does not have the authority to recommend surgery or refer a patient for a surgery consult. Dkt. No. 40-7 at ¶ 4. Moreover, Schmidt is not responsible for scheduling a patient for surgery if surgery is recommended. Id.

Thus, to the extent that Sides contends that Schmidt violated his Eighth Amendment rights because she refused to adhere to Dr. Conete's recommendations or order surgery once Sides' condition deteriorated, the claim cannot stand as Schmidt lacked such authority. See Alston v. Howard, 925 F.Supp. 1034, 1040 n.6 (S.D.N.Y. 1996).

### D. Qualified Immunity

Defendants argue that even if Sides' constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d

211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F.Supp.2d at 230.

Here, Sides has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See subsection II.C. supra.  Because there is no constitutional violation, the undersigned does not reach whether Sides' constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F.Supp.2d at 230.  Accordingly, it is recommended that Defendants' motion on this ground be granted.

### III.  Service on Snyder

Defendants advise the Court that Snyder has not been served with process.  Dkt. No. 40-8 at 3, n.1.  As such, Snyder's liability is not addressed in the within motion.  Where a defendant has not been served with process within 120 days after the complaint is filed, the Court must, on motion or *sua sponte* after notifying the plaintiff, dismiss the complaint

without prejudice as to that defendant or "order that service be made within a specified time." FED. R. CIV. P. 4(m). If, however, the plaintiff demonstrates good cause for service failures, the Court must also extend the time to serve. Id. Additionally, the Second Circuit has held that "district courts have discretion to grant extensions even in the absence of good cause." Zapata v. City of New York, 502 F.3d 192, 196 (2d Cir. 2007).

In this case, more than four years have passed since Sides filed his Complaint naming Snyder as a defendant. Sides has failed to provide the Court with any reasons, let alone good cause, for the service failure with Snyder. Sides failed to both seek assistance with service and to address this in his opposition to Defendants' motion. Thus, in light of the fact that the statute of limitations has run, the undersigned recommends sua sponte dismissal, with prejudice, of the claims against Snyder.

## IV. Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 40) be **GRANTED** and the complaint be dismissed with prejudice based upon the statute of limitations. If reached, it is alternatively **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on the ground that Plaintiff failed to exhaust his administrative remedies. If reached, it is alternatively **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's Eighth Amendment deliberate medical indifference claims. If reached, it is alternatively **RECOMMENDED** that Defendants' motion for summary judgment on the issue of qualified immunity be

**GRANTED**; and it is further

**RECOMMENDED**, that defendant Snyder be **DISMISSED** *sua sponte*, with prejudice, as a defendant herein; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1( c), the parties have **fourteen** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[15]

**IT IS SO ORDERED.**

Dated: June 3, 2020
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[15]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).